United States Courts
Southern District of Texas
FILED

December 9, 2021

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**Sealed**
Public and unofficial staff access
to this instrument are
prohibited by court order

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No. 20-cr-00583S** |
| | § | |
| **AMIR AQEEL,** | § | **UNDER SEAL** |
| **RIFAT BAJWA,** | § | |
| **PARDEEP BASRA,** | § | |
| **MAYER MISAK,** | § | |
| **MAURICIO NAVIA,** | § | |
| **HAMZA ABBAS,** | § | |
| **KHALID ABBAS,** | § | |
| **SYED ALI, and** | § | |
| **ABDUL FATANI,** | § | |
| | | |
| **Defendants.** | | |

_____/

**SUPERSEDING INDICTMENT**

The Grand Jury charges that:

**GENERAL ALLEGATIONS**

At various times material to this Superseding Indictment:

**The Defendants**

1.      Defendant AMIR AQEEL was a resident of Houston, Texas, within the Southern District of Texas.

2.      Conspirator Siddiq Azeemuddin was a resident of Naperville, Illinois, within the Northern District of Illinois.

3.      Defendant RIFAT BAJWA was a resident of Richmond, Texas, within the Southern District of Texas.

4.      Defendant PARDEEP BASRA was a resident of Houston, Texas, within the Southern District of Texas.

5.      Defendant MAYER MISAK was a resident of Cypress, Texas, within the Southern District of Texas.

6.      Defendant MAURICIO NAVIA was a resident of Katy, Texas, within the Southern District of Texas.

7.      Conspirator Richard Reuth was a resident of Spring, Texas, within the Southern District of Texas.

8.      Defendant HAMZA ABBAS was a resident of Richmond, Texas, within the Southern District of Texas

9.      Defendant KHALID ABBAS was a resident of Richmond, Texas, within the Southern District of Texas.

10.      Defendant SYED ALI was a resident of Sugar Land, Texas, within the Southern District of Texas.

11.      Defendant ABDUL FATANI was a resident of Richmond, Texas, within the Southern District of Texas.

12.      Conspirator Jesus Acosta Perez was a resident of Houston, Texas, within the Southern District of Texas.

**Relevant Entities**

13.      AF Logistics, LLC ("AF Logistics") was a Texas Limited Liability Company that was registered on or about February 6, 2018 to BASRA.

14.     Basra, LLC ("Basra") was a Texas Limited Liability Company that was registered on or about May 13, 2014.   On or about June 17, 2019, BASRA became the registered agent for the company.

15.     Champion Automower Inc. ("Champion Automower") was a Texas corporation that was registered on or about October 11, 2018.   Reuth was a manager.

16.     Grandeur Construction, LLC ("Grandeur Construction") was a Texas Limited Liability Company that was registered on or about April 25, 2017 to NAVIA.

17.     Houston Electronic Group, LLC ("Houston Electronic") was a Texas Limited Liability Company that was registered on or about January 30, 2018.

18.     Jonathan's Farms, Inc. ("Jonathan's Farms") was a Texas corporation that was registered on or about February 19, 2003.

19.     Kata Services, LLC ("Kata") was a Texas Limited Liability Company that was registered on or about September 12, 2017 to AQEEL.   BAJWA was listed as a manager.

20.     Log and Sod Leasing, LLC ("Log and Sod Leasing") was a Texas Limited Liability Company that was registered on or about January 3, 2005 to Reuth.

21.     Popeshenouda, LLC ("Popeshenouda") was a Texas Limited Liability Company that was registered on or about February 7, 2019 to MISAK.

22.     Sanad Inc. ("Sanad") was a Texas Corporation that was registered on or about February 18, 2005.

23.     U.S. Auto Exchange Inc. ("US Auto Exchange") was a Texas corporation that was registered on or about July 20, 2017.

24.     Youkeva LLC ("Youkeva") was a Texas Limited Liability Company that was registered on or about February 17, 2017.

25.     Acosta Diesel Truck Service, LLC ("Acosta Diesel") was a Texas Limited Liability Company that was registered on or about June 13, 2019 to Perez.

26.     AR20, LLC ("AR20") was a Texas Limited Liability Company that was registered on or about January 3, 2020.

27.     Bonanza Trading LLC ("Bonanza") was a Texas Limited Liability Company that was registered on or about September 15, 2015.

28.     BZS, Inc ("BZS") was a Texas corporation that was registered on or about May 3, 2010.

29.     Event Palace, Inc ("Event Palace") was a Texas corporation that was registered on or about February 18, 2019 to ALI.

30.     Faz Inc ("Faz") was a Texas corporation that was registered on or about May 17, 2007 to ALI.

31.     M&M Stores, Inc. ("M&M") was a Texas corporation that was registered on or about November 11, 2016 to HAMZA ABBAS.

32.     Route 786 USA Inc. ("Route 786") was a Texas corporation that was registered on or about May 27, 2014 to FATANI.

33.     Shield Trucking, LLC ("Shield Trucking") was a Texas Limited Liability Company that was registered on or about July 16, 2014 to Perez.

34.     Star Line Logistics, LLC ("Star Line") was a Texas Limited Liability Company that was registered on or about January 29, 2020.

35.     Z Cellular LLC ("Z Cellular") was a Texas Limited Liability Company that was registered on or about July 6, 2020 to FATANI.

4

### *The Small Business Administration*

36.     The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.   The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### *The Paycheck Protection Program*

37.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.   One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP").   In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

38.     In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business.   The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.   In the PPP loan application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees.   These figures were used to calculate the amount of money the small business was eligible to receive under the PPP.   In addition, the applicant was required to provide documentation showing its payroll expenses.

39.     A business's PPP loan application was received and processed, in the first instance, by a participating lender.   If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies.   Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

40.     PPP loan proceeds were required to be used by the business on certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities.   The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

### *Relevant Lending Institutions & Other Financial Institutions*

41.     Bank 1 was a federally insured financial institution based in New York.

42.     Bank 2 was a federally insured financial institution based in Florida.

43.     Bank 3 was a federally insured financial institution based in Utah.

44.     Bank 4 was a federally insured financial institution based in New York.

45.     Bank 5 was a credit union based in Texas.

46.     Bank 6 was a federally insured financial institution based in North Carolina.

47.     Bank 7 was a federally insured financial institution based in California.

48.     Bank 8 was a commercial bank based in Pakistan.

49.     Bank 9 was a bank based in Pakistan.

50.     Bank 10 was a federally insured financial institution based in Texas.

51.     Bank 11 was a federally insured financial institution based in Texas.

52.     Bank 12 was a federally insured financial institution based in New Jersey and New York.

53.     Bank 13 was a federally insured financial institution based in Missouri.

54.     Bank 14 was a federally insured financial institution based in Virginia.

55.     Bank 15 was a federally insured financial institution based in California.

56.     Bank 1, Bank 2, Bank 3, Bank 10, Bank 11, Bank 12, and Bank 13 were authorized by the SBA to participate as PPP lenders to small businesses.

57.     Company 1, Company 2, and Company 3 were financial-technology companies. Company 1 and Company 2 were based in California, and Company 3 was based in Georgia. Company 1, Company 2, and Company 3 participated in the SBA's PPP by, among other things, acting as service providers between small businesses and certain lenders.   Small businesses seeking a PPP loan could apply through these companies, which would review the PPP loan applications.   If a PPP loan application received by one of these companies was approved for funding, a partner lender, such as Bank 3, disbursed the loan funds to the applicant.

**OVERVIEW OF THE CONSPIRACY AND THE SCHEME TO DEFRAUD**

58.     Beginning in or around April 2020, and continuing until at least in or around November 2020, within the Southern District of Texas, and elsewhere, the defendants conspired together and with others, known and unknown to the Grand Jury, and with intent to defraud, devised, participated in, executed, and attempted to execute a scheme and artifice to defraud the SBA, Bank 1, Bank 2, Bank 3, Bank 10, Bank 11, Bank 12, Bank 13, Company 1, Company 2, and Company 3, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

59.     As part of the conspiracy and scheme, the defendants and their co-conspirators submitted, and caused to be submitted, false and fraudulent PPP loan applications in the names of certain entities to various lenders and companies.   Many of these fraudulent PPP loan applications were approved and the PPP loans were subsequently funded, as described below.

| Business Name | Lender / Company | Business Owner | Approximate Loan Amount | Funded |
|---|---|---|---|---|
| AF Logistics | Bank 1 | Person 1 | $565,082 | Yes |
| Basra | Company 1 / Bank 3 | BASRA | $67,691 | Yes |
| Champion Automower | Bank 1 | Reuth | $511,250 | Yes |
| Grandeur Construction | Company 2 | NAVIA | $455,916.65 | Yes |
| Houston Electronic | Bank 2 | Person 2 | $552,600 | Yes |
| Jonathan's Farms | Bank 2 | Person 3 | $331,600 | Yes |
| Kata | Company 2 | BAJWA | $176,332.50 | Yes |
| Log & Sod Leasing | Bank 1 | Person 4 | $564,165 | No |
| Popeshenouda | Bank 1 | MISAK | $175,000 | Yes |
| Sanad | Company 3 | Person 5 | $468,460 | Yes |
| US Auto Exchange | Company 3 | Person 6 | $470,880 | Yes |

| | | | | |
|---|---|---|---|---|
| Youkeva | Bank 1 | Person 7 | $235,830 | Yes |
| Acosta Diesel | Bank 13 | Perez | $187,500 | Yes |
| AR20 | Bank 1 | Person 11 | $498,415 | Yes |
| Bonanza | Bank 1 | Person 13 | $479,164 | Yes |
| BZS | Company 3/ Bank 12 | Person 12 | $454,166 | Yes |
| Event Palace | Bank 11 | ALI | $375,000 | No |
| M&M | Company 1 / Bank 3 | HAMZA ABBAS | $278,750 | Yes |
| Route 786 | Bank 1 | FATANI | $511,250 | Yes |
| Shield Trucking | Bank 10 | Perez | $203,800 | Yes |
| Star Line | Bank 10 | Person 14 | $161,400 | Yes |

## PURPOSE OF THE CONSPIRACY AND SCHEME TO DEFRAUD

60.     It was the purpose of the conspiracy and scheme to defraud for the defendants and their co-conspirators to unjustly enrich themselves by fraudulently obtaining PPP loans under false and misleading pretenses and to conceal the conspiracy and scheme from law enforcement.

**MANNER AND MEANS OF THE CONSPIRACY AND SCHEME**

61.     Beginning in or around April 2020, and continuing until at least in or around November 2020, the defendants and their co-conspirators submitted and caused the submission of over 80 PPP loan applications, including, but not limited to, those listed in the chart following Paragraph 59 (collectively, the "PPP Loan Applications").   The defendants and their co-conspirators submitted certain loan applications in the names of individuals who were unaware of the scheme and whose identities were stolen by the defendants and others.   In support of the PPP Loan Applications, the defendants and others submitted, and caused to be submitted, false and fraudulent documentation purporting to substantiate the monthly payroll expenses, assets, and employee count alleged in the PPP Loan Applications.   This supporting documentation included false and fraudulent financial documents such as bank statements and Internal Revenue Services ("IRS") forms, in which the purported payroll expenses and the number of employees were fabricated and inflated.   The defendants and their co-conspirators also falsely certified on the PPP Loan Applications that the PPP loan funds would be used to retain workers and cover payroll expenses, and to make business mortgage interest payments, lease payments, and/or utility payments.   In reality, however, the defendants intended to and did in fact use the PPP Loan Application funds impermissibly for their personal use and benefit.

62.     After receiving the fraudulent loans, the defendants laundered a portion of the loan funds through the use of fake payrolls in order to make the loans potentially forgivable at a later date.

63.     On numerous occasions during the course of and in furtherance of the conspiracy and scheme, the defendants created fraudulent documents and/or attempted to procure documents from government agencies to make the businesses listed on the PPP loan applications appear to be

active and legitimate when, in fact, the businesses were dormant.   On some occasions, the defendants communicated over text message and explicitly stated how they would create fraudulent documents or attempt to reinstate inactive entities to make the companies appear eligible for PPP loans.

a.      On or about July 7, 2020, AQEEL and NAVIA exchanged text messages regarding the creation of fraudulent tax documents (IRS Form 940, IRS Form 941, and/or IRS Form W-3) in connection with a PPP loan application on behalf of Jonathan's Farms, stating, in sum and substance:

| | |
|---|---|
| AQEEL: | Brother, we will need form 940 for Jonathan farms |
| NAVIA: | I'll get them done tomorrow morning is that ok? Or you need them tonight? |
| NAVIA: | What does the yearly have to look like? |
| AQEEL: | We already did his W3. |
| AQEEL: | Tomrrow am is fine like 8am. |
| NAVIA: | I'll get it done tonight bro. |
| NAVIA: | Sent bro to . . . email. |
| NAVIA: | All quarters 2019 and quarter 1 2020. |
| AQEEL: | I think all we needed was one 940. |
| AQEEL: | Not 941. |

A PPP loan application on behalf of Jonathan's Farms, which included false and fraudulent tax documents, including a fraudulent IRS Form W-3 and an IRS Form 940, was submitted to Bank 2.   Bank 2 funded the loan for approximately $331,600.   The PPP loan application fraudulently represented that Jonathan's Farms had 24 employees, when in fact the company had no employees on record.

11

b.      On or about May 13, 2020, AQEEL and HAMZA ABBAS exchanged text messages regarding forging documents to submit with PPP loan applications on behalf of Star Line, which was owned by a relative of HAMZA ABBAS, and M&M, which was owned by HAMZA ABBAS:

| | |
|---|---|
| HAMZA ABBAS: | Uncle, Starline bank account was not open in February.[1] What if I change the name on different statements and edit them and make it show as Starline. |
| AQEEL: | OK sure please do that |
| AQEEL: | How about the account number use Perosnal account then please |
| HAMZA ABBAS: | For personal account I'll send it to you and bank statement I will edit the name any of them |
| HAMZA ABBAS: | Does it matter if I just change the name and on the M&M store statement and also the bank account number in statement to match the personal bank account |
| HAMZA ABBAS: | I mean change the M&M name from bank statement and put StarLine logistics and also change bank account on the stamen |

On or about May 15, 2020, a PPP loan application on behalf of M&M was submitted to Bank 3. The application included the false and fraudulent documents created by HAMZA ABBAS.   On or about May 20, 2020, Bank 3 disbursed a PPP loan for M&M in the amount of $278,750. Approximately six days after Bank 3 disbursed the PPP loan, HAMZA ABBAS and AQEEL attempted to transfer approximately $108,000 in PPP loan funds to pay off a home mortgage of AQEEL.

---

[1] Some of these conversations are translated from a foreign language.

       c.      On or about May 18, 2020, HAMZA ABBAS emailed two fraudulent bank statements that he had created to AQEEL.   AQEEL and HAMZA ABBAS later disputed how much HAMZA ABBAS was to be paid for forging bank statements.   On or about May 21, 2020, HAMZA ABBAS and AQEEL exchanged the following text messages:

| | |
|---|---|
| HAMZA ABBAS: | Uncle when will I get the 5K per statementt |
| AQEEL: | Sure let me leave 52K and 5K Statement in your account and rest I will withdraw…is it good? |
| HAMZA ABBAS: | Wasn't it 10K. 5k each |
| AQEEL: | No |
| AQEEL: | I promise only 3K |

       d.      On or about June 15, 2020, AQEEL and BASRA exchanged text messages regarding securing a PPP loan for AF Logistics.   AF Logistics was an inactive corporation in 2020 and, therefore, would have been ineligible for a PPP loan.   Nevertheless, AQEEL and BASRA sought to obtain documents from the State of Texas that would make the business appear to be active to lenders:

| | |
|---|---|
| AQEEL: | We need to pay franchise fee and request reinstatement ASAP |
| AQEEL: | Let me try on line |
| AQEEL: | Do you have webfile number for af logis? |
| BASRA: | I have everything |

Later that same day, after exchanging additional text messages, AQEEL sent BASRA a text message with a screenshot from the Texas Comptroller website showing that "Amir Aqeel" had paid a franchise tax for AF Logistics.   AQEEL and BASRA then exchanged the following text messages:

| BASRA: | Excellent! |
|---|---|
| AQEEL: | I already took care of it ... should let me print good standing certificate in couple days |
| AQEEL: | Then will repeat reinstatement |

A PPP loan application on behalf of AF Logistics, which included false and fraudulent tax documents, including fraudulent IRS Forms 941, was submitted to Bank 1.  Bank 1 funded the loan for approximately $565,082.  The PPP loan application fraudulently represented that AF Logistics had 29 employees, when in fact the company had no employees on record.

64.    In furtherance of the conspiracy and scheme, the defendants often submitted fraudulent PPP loan applications and received fraudulent PPP loan funds on behalf of companies that the defendants knew were inactive companies with no employees.  On occasion, the defendants and others referred to these companies as "shelf" companies and explicitly acknowledged that they were inactive companies.

a.    On or about June 30, 2020, AQEEL and Reuth exchanged text messages multiple times regarding opening a bank account for Log and Sod Leasing in order to secure a PPP loan before the PPP ended.  In these conversations, AQEEL acknowledged that Log and Sod Leasing as well as other entities under Reuth's control, were not active entities with actual employees.  Then, on or about July 1, 2020, AQEEL texted Reuth, "We got extensions in PPP…Let's renew all companies to different people…Yahooooooo…I meant your shelf companies."

65.    As part of the conspiracy and scheme, the defendants recruited third parties and used the third parties' corporate entities to apply for additional PPP loans.  The defendants and others divided the proceeds of these fraudulently obtained PPP loans amongst themselves.

14

a.      KHALID ABBAS supplied AQEEL and others with information about Acosta Diesel and Shield Trucking, two corporate entities that were controlled by Perez.   On or about June 18, 2020, a PPP loan application on behalf of Acosta Diesel was submitted to Bank 13. The PPP loan application contained false and fraudulent representations as to Acosta Diesel's number of employees and average monthly payroll.   Bank 13 authorized a PPP loan in the amount of approximately $187,500 to Acosta Diesel.   Within a day of receiving the loan funds, Perez provided approximately $93,750 of the fraudulently obtained PPP loan funds to KHALID ABBAS.

b.      On or about May 22, 2020, AQEEL and MISAK submitted fraudulent PPP loan applications on behalf of two entities that MISAK controlled (Popeshenouda and Youkeva). AQEEL and MISAK agreed that for these PPP loans, AQEEL would receive 33% of the proceeds. In one text message exchange regarding the division of proceeds, in which MISAK threatened to report AQEEL to the police, AQEEL wrote to MISAK: "With a payroll of 0 dollar how you got approved for 400K."   MISAK did not respond.   After receiving PPP loan proceeds from at least two fraudulent PPP loans, MISAK recruited additional companies that were used by the defendants to submit false PPP loan applications.   On or about July 24, 2020, MISAK texted AQEEL about new companies he had recruited: "Sent you 6 different profiles…I told them already for every 100k they will get on $33K…They all agreed."

c.      On or about June 19, 2020, AQEEL, in conjunction with ALI, submitted a PPP loan application on behalf of ALI's company, Event Palace, to Bank 11.   The PPP loan application contained false and fraudulent representations as to the number of employees and average monthly payroll.   Bank 11 denied the loan application because it could not verify that Event Palace was an actual company.

d.      ALI also recruited others to join the conspiracy and scheme in exchange for kickbacks.   For example, ALI supplied AQEEL with information about BZS, a company owned by Person 12.   A PPP loan application on behalf of BZS was submitted to Company 3.   The PPP loan application contained false and fraudulent representations as to BZS's number of employees and average monthly payroll.   Company 3 authorized a PPP loan in the amount of approximately $454,166.   When Person 12 sought to return the loan, ALI threatened Person 12, telling Person 12: "You are getting in trouble and you will get all others in trouble too. Why are you putting them at risk? You got the loan, use it and then return."[2]

66.      At times, the defendants sought to disguise the true nature of their companies, which either had no employees or had fewer employees than what was represented on the PPP Loan Applications, by creating fraudulent payrolls following the successful receipt of fraudulently obtained PPP loans.

a.      On or about August 5, 2020, Bank 10 disbursed a PPP loan in the amount of approximately $203,800 to Shield Trucking.   The PPP loan application contained false and fraudulent representations as to Shield Trucking's number of employees and average monthly payroll.   KHALID ABBAS instructed Perez to launder PPP loan funds through the creation of fake payrolls and provided Perez with the names of fake employees to put on Cashier's checks. KHALID ABBAS then cashed the Cashier's checks of the fake employees and retained those funds, which totaled approximately $101,525.

b.      On or about June 5, 2020, Bank 1 disbursed a PPP loan in the amount of approximately $498,415 to AR20.   KHALID ABBAS cashed checks for fake employees of AR20, which totaled approximately $271,212.95.   The fake employee names put on the checks

---

[2] This conversation was in English and Urdu.

for AR20 were some of the same names of the fake employees used on the Cashier's checks for the Shield Trucking loan.

67.    On multiple occasions, the defendants exchanged text messages regarding lists of fake employees, many of whom were friends or relatives of the defendants.

a.    On or about July 9, 2020, AQEEL and NAVIA exchanged text messages regarding payroll:

| | |
|---|---|
| AQEEL: | We are gonna run it 75k for each company |
| AQEEL: | Every two weeks, to be on safe side |
| NAVIA: | Ok so lemme call [IM] to make sure the numbers will meet that quota |
| NAVIA: | No check over 4000 |
| AQEEL: | True plus the employees count too |
| NAVIA: | Ok brother when you can send me the names or, we can give check guy the checks and send him the names like I did last time |
| NAVIA: | Whatever you think is best |
| AQEEL: | I just send you the name and list |
| AQEEL: | Start from list 1 and go all the way to list 5 |
| AQEEL: | Just keep the check between 3000 and 3500 |
| AQEEL: | Don't forget to put pay check for reference and today's date |
| NAVIA: | Ok |
| AQEEL: | Let [RM] aka check Guy, know |

b.    On or about August 12, 2020, AQEEL and BAJWA exchanged text messages about the company IB Floors, LLC ("IB Floors"), whose two PPP loan applications were

17

cancelled and not funded.   BAJWA texted AQEEL: "For IB FLOORS there is no F941.  How many employees for W2 and which employee list to use?"

       c.      On or about June 30, 2020, FATANI and AQEEL exchanged text messages about FATANI's company, Route 786.   Despite having no real employees, Route 786 had received a PPP loan in the amount of approximately $511,250.   The PPP loan application on behalf of Route 786 contained false and fraudulent representations as to the number of employees and average monthly payroll.   AQEEL and FATANI exchanged the following text messages:

| FATANI: | $100K were taken out just to update |
|---|---|
| FATANI: | When is the next payroll check. |
| AQEEL: | It's on ist and 16th of every of every month |
| AQEEL: | Thanks for update |
| FATANI: | So tomorrow is 1st |

FATANI then sent a text message to AQEEL with an image of 13 checks from Route 786 and each check listed "payroll" as the purpose of the payment.

      68.    As part of the conspiracy, the defendants hid the true nature of the fraud by writing purported paychecks to fake employees.   The fake employees listed on these paychecks included some of the defendants and some of their relatives.   Many of these fake employees received checks from multiple companies.

       a.      Person 8, a woman over 80 years of age and the mother of AQEEL, received checks from at least six different companies that received fraudulent PPP loans, in addition to receiving unemployment benefits.   In actuality, Person 8 was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

b.      NAVIA received checks from at least eight different companies that received fraudulent PPP loans, in addition to receiving a fraudulent PPP loan in the amount of approximately $455,916.65 for his own company, Grandeur Construction.   In actuality, NAVIA was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

c.      Person 9 received checks from at least nine different companies.   In actuality, Person 9 was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

d.      Person 10, a relative of Azeemuddin, received checks from at least four different companies, including Grandeur Construction, which was owned by NAVIA.   In actuality, Person 10 was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

e.      BASRA received checks from at least four entities that received fraudulent PPP loans in addition to receiving a fraudulent PPP loan in the amount of approximately $67,691 for her own company, Basra.   In actuality, BASRA was not an employee of the other four entities and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.   During the same period, BASRA also received unemployment benefits.

69.      As part of the conspiracy and scheme, the defendants laundered a portion of the fraudulently obtained PPP loan proceeds by cashing checks on behalf of fake employees.   The defendants often utilized Fascare International, Inc., doing business as Almeda Discount Store ("Almeda"), which was owned by Azeemuddin.   During the course of the conspiracy and scheme, over 1,100 fake paychecks totaling over $3 million in fraudulent PPP loan proceeds were cashed at Almeda.   On occasion, the defendants communicated about the use of Almeda to hide the fraud.

19

a.     On or about May 13, 2020, AQEEL texted Azeemuddin: "I will wash some checks through your company too."

b.     On or about June 22, 2020, Azeemuddin texted AQEEL, "Also please send names for checks…9 names…will use below 9 names."   AQEEL responded with 9 names, which included BAJWA, MISAK, NAVIA, and Reuth.

70.     In total, the defendants submitted over 80 fraudulent PPP loan applications to various lenders seeking over $35 million in PPP loan funds.   Ultimately, through the conspiracy and scheme, the defendants obtained approximately $18 million in fraudulent PPP loan funds, which they used for their personal benefit.   Because the PPP loan funds were guaranteed by the SBA, the defendants and their co-conspirators, defrauded, among others, the SBA, Bank 1, Bank 2, Bank 3, Bank 10, Bank 11, Bank 12, Bank 13, Company 1, Company 2, and Company 3.

## COUNT 1
### Conspiracy to Commit Wire Fraud
### (18 U.S.C. § 1349)

71.     Paragraphs 1 through 70 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

72.     From in or around April 2020 through at least in or around November 2020 in the Southern District of Texas, and elsewhere, the defendants,

**AMIR AQEEL, RIFAT BAJWA, PARDEEP BASRA, MAYER MISAK,**

**MAURICIO NAVIA, HAMZA ABBAS, KHALID ABBAS, SYED ALI, and**

**ABDUL FATANI**

did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, namely: wire fraud, that is, to knowingly devise and intend to devise, a scheme and artifice to defraud, and to

20

obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

73.     Paragraph 60 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated as a description of the purpose of the conspiracy.

## MANNER AND MEANS OF THE CONSPIRACY

74.     Paragraphs 61 through 70 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated as a description of the manner and means of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2 THROUGH 13
### Wire Fraud
### (18 U.S.C. § 1343)

75.     Paragraphs 1 through 70 of the General Allegations section of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

76.     Beginning in or around April 2020, and continuing through in or around November 2020, in the Southern District of Texas and elsewhere, the defendants,

**AMIR AQEEL, RIFAT BAJWA, PARDEEP BASRA, MAYER MISAK, MAURICIO NAVIA, HAMZA ABBAS, KHALID ABBAS, SYED ALI, and ABDUL FATANI,**

knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

21

77.     On or about the dates listed below, in the Southern District of Texas and elsewhere, the following defendants, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did, with intent to defraud, cause the wire communications identified below to be transmitted by means of wire communication in interstate commerce.

| COUNT | DEFENDANT(S) | APPROX. DATE | INTERSTATE WIRE COMMUNICATION |
|---|---|---|---|
| 2 | AQEEL BASRA | May 12, 2020 | PPP loan application on behalf of Basra electronically submitted from Texas, and routed interstate through Company 1's servers outside of Texas. |
| 3 | AQEEL MISAK | June 1, 2020 | Wire transfer of $175,000 representing a PPP loan disbursement from an account at Bank 1 to an account at Bank 6 in the Southern District of Texas. |
| 4 | AQEEL BASRA | June 3, 2020 | Wire transfer of $565,082 representing a PPP loan disbursement from an account at Bank 1 to an account at Bank 6 in the Southern District of Texas. |
| 5 | AQEEL | June 5, 2020 | Wire transfer of $511,250 representing a PPP loan disbursement from an account at Bank 1 to an account at Bank 5. |
| 6 | AQEEL MISAK | June 8, 2020 | Wire transfer of $235,830 representing a PPP loan disbursement from an account at Bank 1 to an account at Bank 4 in the Southern District of Texas. |
| 7 | AQEEL BAJWA | June 22, 2020 | PPP loan application on behalf of Kata electronically submitted from Texas, and routed interstate through Company 2's servers outside of Texas. |
| 8 | AQEEL NAVIA | June 26, 2020 | PPP loan application on behalf of Grandeur Construction electronically submitted from Texas, and routed interstate through Company 2's servers outside of Texas. |
| 9 | AQEEL | July 15, 2020 | Submission of wire instructions in connection with a PPP loan application on behalf of Log and Sod Leasing via email to Bank 1. |

| COUNT | DEFENDANT(S) | APPROX. DATE | INTERSTATE WIRE COMMUNICATION |
|---|---|---|---|
| 10 | AQEEL<br><br>HAMZA ABBAS | May 20, 2020 | Wire transfer of $278,750 representing PPP loan disbursement from an account at Bank 3 to an account at Bank 6 in the Southern District of Texas. |
| 11 | AQEEL<br><br>KHALID ABBAS | June 24, 2020 | Wire transfer of $187,500 representing PPP loan disbursement from an account at Bank 13 to an account at Bank 6 in the Southern District of Texas. |
| 12 | AQEEL<br><br>ALI | July 7, 2020 | Wire transfer of $454,166 representing PPP loan disbursement from an account at Bank 7 to an account at Bank 4. |
| 13 | AQEEL<br><br>FATANI | June 26, 2020 | An electronic transfer via check from Bank 14 to Bank 6. |

All in violation of Title 18, United States Code, Sections 1343 & 2.

### COUNTS 14 AND 15
### Aggravated Identity Theft
### (18 U.S.C. § 1028A(a)(1))

78.     Paragraphs 1 through 70 of the General Allegations section of the Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

79.     On or about the dates specified in each count below, in, in the Southern District of Texas, and elsewhere, the defendant,

**AMIR AQEEL,**

during and in relation to a felony violation of Title 18, United States Code, Section 1343, that is, wire fraud, did knowingly transfer, possess and use, without lawful authority, the means of another person, as specific in each count below:

| Count | Approx. Date | Means of Identification |
|---|---|---|
| 14 | June 1, 2020 | Name, social security number, and date of birth belonging to S.A. submitted to Bank 1 as part of PPP application in name of Route 786. |

| 15 | June 1, 2020 | Name, social security number, and date of birth belonging to J.A. submitted to Bank 1 as part of PPP application in name of Bonanza. |

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## COUNTS 16 THROUGH 21
**Engaging in a Monetary Transaction with Criminally Derived Property**
**(18 U.S.C. § 1957)**

80.     Paragraphs 1 through 70 of the General Allegations section of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

81.     On or about the dates listed below, in the Southern District of Texas, and elsewhere, the following defendants,

**AMIR AQEEL, KHALID ABBAS, SYED ALI, and ABDUL FATANI,**

did knowingly engage and attempt to engage in the following monetary transactions, by, through, and to a financial institution affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, a transfer and withdrawal of funds, such property being derived from a specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343:

| COUNT | DEFENDANT | APPROX. DATE | FINANCIAL TRANSACTION | APPROX. AMOUNT |
|---|---|---|---|---|
| 16 | AQEEL | May 15, 2020 | Wire transfer from account ending in 3818 at Bank 4, held in the name of "Aqeel Amir dba IRS Services," to a bank account at Bank 8 in Pakistan. | $50,000 |
| 17 | AQEEL | June 10, 2020 | Wire transfer from account ending in 3782 at Bank 4, held in the name of "Aqeel Amir dba Tax Star Ins & Financials," to a | $50,000 |

| | | | bank account at Bank 9 in Pakistan. | |
|---|---|---|---|---|
| 18 | AQEEL | August 13, 2020 | Withdrawal from a checking account ending in 3645 at Bank 5, held in the name of "IRS Services" to purchase Official Check 425410 to Patten Title Company for the purchase of the Majestic Canyon Lane real property / AQEEL's residence. | $550,000 |
| 19 | KHALID ABBAS | August 7, 2020 | Withdrawal from a checking account ending in 9207 at Bank 6, held in the name of Shield Trucking, which was used to purchase 15 Cashier's checks. | $101,750 |
| 20 | SYED ALI | August 4, 2020 | Payment in the form of a check from a checking account ending in 4257 at Bank 4, held in the name of Lazeeza Restaurant, for loan number ending in 0270 at Bank 15, held in the name of Faz. | $42,262 |
| 21 | FATANI | July 14, 2020 | Deposit of check from a checking account ending in 0059 at Bank 14, held in the name of Route 786, into an account ending in 7076 at Bank 4, held in the name of Z Cellular. | $100,000 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF FORFEITURE

### (18 U.S.C. §§ 981(a)(1)(C) & 982(a)(1))

82.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the United States gives notice that upon a defendant's conviction of a Section 1349 or 1343 offense as charged in this Superseding Indictment, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

83.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice that upon a defendant's conviction of a money laundering offense as charged in this Superseding Indictment, the United States will seek forfeiture of all property, real or personal, involved in money laundering offenses or traceable to such property.

<u>Specific Property Subject to Forfeiture</u>

84.     The property subject to forfeiture includes, but is not limited to, the following:

    (a) real property on Majestic Canyon Lane in Houston, Texas, together with all improvements, buildings, structures and appurtenances, and legally described as follows:

        Lot 2, in Block 1 of VINTAGE LAKES, SECTION TWO (2), PARTIAL REPLAT NO. 3, a Subdivision of Harris County, Texas according to the map or plat thereof, recorded at Film Code No. 630270 of the Map Records of Harris County, Texas.

    (b) 2013 Lamborghini Gallardo Spyder, VIN ZHWGU6BZ8DLA12803, purchased in or about June 2020 and registered and titled to Texas Star Ins & Financials, LLC, which is a business registered to AQEEL.

    (c) 2014 Porsche Panamera, VIN WP0AD2A73EL044709, titled to Amir AQEEL, for which the automobile lien was paid off in May 2020.

    (d) $108,100.00 in cash seized from the AQEEL residence.

    (e) $156,906.56 seized from a First Service Credit Union checking account held in the name of IRS Services, with an account number ending in 3645.

(f) $88,692.22 seized from a First Service Credit Union savings account held in the name of IRS Services, with an account number ending in 3645.

(g) $117,576.98 seized from a First Service Credit Union checking account held in the name of Tax Star Ins & Financials, with an account number ending in 5415.

(h) $74,542.75 seized from a First Service Credit Union savings account held in the name of Tax Star Ins & Financials, with an account number ending in 5415.

(i) $99,800.00 seized from a First Service Credit Union checking account held in the name of A&H Heyville LLC, with an account number ending in 7320.

(j) $55,327.50 seized from a First Service Credit Union savings account held in the name of A&H Heyville LLC, with an account number ending in 7320.

(k) $16,530.00 seized from a JPMorgan Chase Bank account held in the name of Amir Aqeel dba Tax Star Ins & Financials, with an account number ending in 3782.

(l) $93,400.00 deposited on or about May 29, 2020, and seized from a suspense account at M&T Bank held in the name of Saima Aqeel, to be paid towards a mortgage note with borrowers Saima Aqeel and Amir Aqeel, with an account number ending in 1137.

(m) $218,887.00 deposited on or about November 2, 2020, and seized from a suspense account at M&T Bank held in the name of Saima Aqeel, to be paid towards a mortgage note with borrowers Saima Aqeel and Amir Aqeel, with an account number ending in 1137.

(n) $100,000.00 seized from a First Service Credit Union checking account held in the name of Amir Aqeel, with an account number ending in 4580.

(o) $233,667.20 seized from a Bank of America account held in the name of AF Logistics LLC, with an account number ending in 6181.

27

(p) $96,036.93 seized from a Bank of America account held in the name of AF Logistics LLC, with an account number ending in 6181.

(q) $92,691.00 seized from a Prosperity Bank account in the name of Basra LLC dba Beechnut Food Market, with an account number ending in 6787.

(r) real property at 16310 & 16312 FM 529 in Houston, Texas, together with all improvements, buildings, structures and appurtenances, and legally described as follows:

> All of CAPTAIN D'S at FM 529 SUBDIVISON, a subdivision of 1.377 acres of land in the W.I. Williamson Survey, A-1487, according to the map or plat thereof, recorded under Film Code No. 612239 of the MAP Records of Harris County, Texas.

### Money Judgment and Substitute Property

85.     The United States will seek the imposition of a money judgment against each defendant.  In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant in substitution up to the amount of the money judgment against that defendant.


                              A TRUE BILL:



                              FOREPERSON

28

JENNIFER LOWERY

ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF TEXAS

By: *Rodolfo Ramirez*
RODOLFO RAMIREZ
ASSISTANT UNITED STATES ATTORNEY

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

LOUIS MANZO
DELLA SENTILLES
TRIAL ATTORNEYS
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE